IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 27, 2024 Session

**STATE OF TENNESSEE v. TIMOTHY DION WELLS**

**Appeal from the Criminal Court for Knox County**
**No. 116128    Kyle A. Hixson, Judge**

_____

**No. E2023-00516-CCA-R3-CD**

_____

The Defendant, Timothy Dion Lewis, was convicted by a Knox County Criminal Court jury of second degree murder, for which he is serving a twenty-two-year sentence as a Range I offender. *See* T.C.A. § 39-13-210(a)(1) (2018). On appeal, he contends that: (1) the evidence is insufficient to support his conviction, (2) the trial court erred in various evidentiary rulings, (3) he is entitled to a new trial based upon the cumulative effect of multiple trial errors, and (4) his sentence is excessive. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and MATTHEW J. WILSON, JJ., joined.

Mary Eugenia "Gena" Lewis (at trial, motion for new trial hearing, and on appeal) and T. Scott Jones (at trial and sentencing hearing), Knoxville, Tennessee, for the appellant, Timothy Dion Wells.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Charme Allen, District Attorney General; Nathaniel Ogle, Assistant District Attorney General; and Rebecca Spicer-Keller, Special Prosecuting Attorney, for the appellee, State of Tennessee.

# OPINION

The Defendant's conviction relates to the March 31, 2019 shooting death of Sherril Johnson, who had been in a romantic relationship with the Defendant. The Defendant called 9-1-1 at 1:45 a.m. to report that the victim had committed suicide, and police responded, discovering the deceased victim, who had a gunshot wound to the head, lying in a pool of blood in the kitchen of the Defendant's home. The victim and her daughter lived in their own home but were visiting in the Defendant's home on the night of the shooting. The weapon later determined to have fired the fatal gunshot lay on the kitchen table. Other guns and ammunition were found elsewhere in the home. The Defendant agreed to go to the police station, where he gave a statement, initially claiming that the victim shot herself but eventually stating that he accidentally shot her when he pulled the trigger on the gun in an attempt to ascertain whether the safety was engaged.

At the five-day trial, the State theorized that the Defendant committed a knowing killing, that is, second degree murder, of the victim, that the Defendant was interested in resuming a romantic relationship with a former girlfriend, and that the Defendant and the victim had fought publicly on the evening of March 29, 2019. The defense maintained that the shooting had been an unfortunate accident borne of the Defendant's inattention to safety and that he was guilty of nothing greater than reckless homicide or criminally negligent homicide. The parties presented expert witnesses who, predictably, disagreed about the accuracy of the Defendant's account of an accidental shooting, based upon their respective scientific calculations relative to the bullet's trajectory. The jury found the Defendant guilty of second degree murder.

The disputed evidence at the trial related to whether the shooting was accidental or involved greater culpability. The jury heard evidence of the following pretrial statements the Defendant, who did not testify, made about the shooting:

(1) The Defendant stated, "My girlfriend shot herself," in the 9-1-1 call. He also said, "I don't know what the f--- happened." When asked if he thought the shooting had been an accident, he said he did.

(2) In his pretrial statement, the Defendant said he had been in the front of his home. The victim stood in front of the kitchen sink. He went to the bathroom in the back of his home, heard a noise, came to the front, and saw the victim on the floor. The victim gurgled and breathed blood through her nose. He said that he picked up a gun laying by the victim's left side and that he placed it on the table. He was unsure but thought the gun might have been on top of the refrigerator before the shooting.

(3)  After being advised that a technician was going to collect evidence for a gunshot residue test, the Defendant said in his pretrial statement, "Hey, tell you what happened.  I thought the gun was on safety.  I pulled the trigger and hit her on the head."  He said that they were not arguing, that he was seated at the table, that the victim was washing dishes, that he picked up the gun from the table, and pulled the trigger to "see if it was on safety."  He said he pulled the trigger "all the time" to determine if the safety was engaged.  He said the shooting was an accident.  He said he typically left the gun "laying around" with the safety engaged.

(4)  As the Defendant continued to explain in his statement, he had been seated near the glass door and picked up the gun.  He said that he was getting up to put the gun away and that he pulled the trigger one time.  He said he pulled the trigger to see if the safety was engaged.  He said he had not been truthful earlier because he was scared.

(5)  In a telephone call that was recorded during a break in the Defendant's police interview, the Defendant stated that he accidentally shot the victim, who was washing dishes at the sink, when he pulled the trigger and incorrectly thought the gun's safety was engaged.  He said the gun had been on the table next to him because his five-year-old child was in the house.  He said he was going to put the gun on the refrigerator.  He said he normally kept the safety engaged on the gun.  He denied telling the victim's daughter that the victim shot herself and said the victim's daughter made this assumption.

(6)  In another telephone call recorded during a break in the interview, the Defendant stated that he accidentally shot the victim.

(7)  When the interview resumed and after being advised of his rights, the Defendant stated that the victim had stood at the kitchen sink washing dishes, that the Defendant was seated at the table by the glass doors, that he picked up his gun and squeezed the trigger, that the gun's safety was not engaged as it usually was, that the victim fell and bled, and that the Defendant called 9-1-1 and told the operator that the victim shot herself in the head.  When asked why he did not tell the operator the truth, he said that he did not know and that he had been drinking and was not in his "right mind."  He said the gun had been on the table when he, the victim, and his guests had played cards earlier that evening.  When

questioned further, he said he stood and then picked up the gun, walked toward the refrigerator, and pulled the trigger.

(8)  In a written statement the Defendant prepared as part of his pretrial statement, he said that he picked up the gun from the table and pulled the trigger to see if the safety was engaged and that he shot the victim in the head.

(9)  The victim's daughter testified that the Defendant called her after she had left the police station and that he told her he shot the victim accidentally.

(10)  The Defendant's uncle, who had been at the Defendant's home earlier in the evening of the shooting, testified that the Defendant called him shortly after the uncle had left the home and said the victim had been shot and was on the floor. The Defendant's uncle said the Defendant asked him and his wife to return. The uncle said they returned but were not allowed by the police to enter the home. The uncle received a text message from the Defendant when the Defendant was on his way or at the police station. The message said the Defendant was going to tell the police that he accidentally shot the victim.

The jury also heard conflicting evidence about the nature of the relationship between the Defendant and the victim. The Defendant maintained in his pretrial interview that the relationship was not plagued by arguments and volatility. The Defendant's uncle testified that the Defendant and the victim had a good relationship. The uncle acknowledged telling an investigator that the Defendant's relationships were volatile, but he explained at the trial that he had been referring to a relationship the Defendant had before the one with the victim.

The victim's daughter testified that the victim seemed mad when she came in a bedroom to check on the daughter on the night of the shooting.

The victim's friend, who was also a coworker, testified that, in March 2019, the victim had been unhappy in the relationship with the Defendant and planned to end the relationship. The friend said that she and the victim had been at a restaurant with a group of friends on March 29, 2019, and that the Defendant appeared, did not speak to anyone but the victim, and seemed distracted and upset or angry. The friend said that the victim and the Defendant spoke away from the group and that the friend could see the victim's cell phone "out" as the Defendant and the victim were "going back and forth." The friend said that the victim returned to the group's table, that the Defendant left, and that the victim said she "couldn't do it anymore" and was ending the relationship with the Defendant. The

-4-

friend said the victim had been angry because the Defendant questioned her about her cell phone. The friend testified that she received text messages from the victim on March 30, in which the victim invited the friend and the friend's husband to a cookout the victim and the Defendant were having later that day. The friend thought the victim tried to get the friends who had been at the restaurant the previous evening to give the Defendant a "second chance." The friend said she did not attend the cookout.

The State offered evidence of text messages the Defendant sent to both the victim and an ex-girlfriend in the days leading up to the shooting.[1] In a series of messages exchanged with the victim on March 27 and 28, the Defendant bickered and expressed his preference not to end the relationship. He asked if they could remain friends if the romantic relationship ended and questioned why the victim did not want to remain friends. On the afternoon of March 28, he asked the victim to bring him food at work and said he missed her. He told the victim he had cancelled a party because he "wasn't feeling it [be]cause we were into it." On March 29, the Defendant discussed his not having something to wear to a restaurant at which the victim would be that evening. On the evening of March 29, the Defendant bickered with the victim and said she had closed her cell phone quickly when he approached her, which he thought indicated that she did not want him to see something stored on the cell phone. He demanded to know the nature of her relationship with a man, whom he identified by name. The morning of March 30, the Defendant said that he "left" after the victim closed her phone and that, because they were both drinking, he had not wanted to discuss whether she was hiding something. He said he had not wanted to spoil the victim's fun with her friends.

In text messages the Defendant sent to his ex-girlfriend on March 29, 2019, he talked about "kidnap[ping]" the ex-girlfriend for a weekend and professed, "I'm going out with her but want to be with you." He said the ex-girlfriend was "[t]he best woman I [have] ever been with," and he said he had fallen in love with her "so fast." When the ex-girlfriend indicated that she did not want to resume their relationship, the Defendant asked if they could talk "tomorrow," on March 30. He said he just wanted her to know how he felt.

The Defendant acknowledged in his pretrial statement that he owned at least three guns, one of which was the Ruger pistol from which the fatal shot was fired at the victim. The Defendant said that he kept a gun with him and in his vehicle. The Defendant claimed

---

[1] Over the Defendant's objection, the trial court admitted the text messages from the victim and the ex-girlfriend to provide context for the Defendant's messages in the respective conversations. The court instructed the jury that it was not permitted to consider the messages from the victim and the ex-girlfriend as substantive proof.

in his pretrial statement that the Ruger had been on the table on the evening of the shooting, but his uncle did not recall having seen the gun when he was at the Defendant's house. He said that he showed the victim's daughter how to shoot the gun and that he often pulled the trigger on the Ruger to check to see if the safety was engaged. Three guns were recovered at the home. The gun used in the shooting was on the kitchen table, and the other two guns were in a drawer in a bedroom. The gun on the kitchen table contained six rounds in the magazine and a round in the chamber. Ammunition was found in the drawer with the guns in the bedroom and on a television stand in the living room. The victim's daughter testified that the Defendant showed her how to shoot a gun and how the safety worked.

On March 31, 2019, law enforcement personnel found evidence at the scene of alcohol having been consumed but did not find the bullet that had struck the victim. They discovered a cartridge casing under the victim's body when the body was moved. Sergeant Terry instructed the Defendant's sister to notify him if the Defendant's family found the bullet after the scene was released to the Defendant's family. The Defendant's sister testified that she found the bullet imbedded in a cabinet hinge the next day. The Defendant's sister called Sergeant Terry, and an evidence technician came to the Defendant's home and removed the bullet and a hinge from the cabinet and made relevant measurements. The defect in the cabinet and hinge was 59″ above the floor.

A firearms expert testified that the Ruger pistol recovered from the scene was a double-action weapon. He said that the trigger pull was between 5.5 and 6.5 pounds when the gun was functioning as a single-action weapon, with the hammer already cocked. He said that the trigger pull was between 8.75 and 9.75 pounds when the gun was functioning as a double-action weapon, meaning that when the safety was engaged, the initial trigger pull would cock the hammer and a second trigger pull would be required to release the hammer and fire the gun. He did not test the trigger pull required when the safety was engaged.

The State and the Defendant offered expert witness testimony regarding the bullet's trajectory. The Defendant's bullet trajectory reconstruction expert met with the Defendant at the scene, heard the Defendant's account of what happened on the date of the shooting, and examined the scene. Based upon this information and the findings from the autopsy report, the defense expert opined that his analysis of the bullet's trajectory through the victim's skull and into the cabinet was consistent with the Defendant's account of being seated at the kitchen table near a window, picking up the gun at chest height, and accidentally firing the gun as the victim stood at the kitchen sink. The defense expert based his analysis on the assumptions that the gun's muzzle was 46.5″ from the floor when the gun was fired and that the bullet entered the victim's head at 54.75″ from the floor.

The State's bullet trajectory expert performed his analysis after the defense expert had performed his. The State's expert disagreed with the defense expert. The State's expert performed his calculations based upon measurements and information collected by others from the scene and did not personally visit the scene. He opined that the gun's muzzle was 58.3 to 58.5″ above the floor when the gun was fired, with a margin of error of ±5°. In the State's expert's opinion, the defense expert's calculations were flawed and had "lowered the victim's head by 4.05″" to "line up with that flight path." He explained that a drop of this amount was significant and would be consistent with the victim's having leaned over the sink or having bent knees.

After receiving the evidence, the jury found the Defendant guilty of second degree murder. At a sentencing hearing, the trial court imposed a twenty-two-year sentence. This appeal followed.

# I

### Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his second degree murder conviction. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn.

2009)). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

As relevant to this appeal, second degree murder is an unlawful and knowing killing of another. T.C.A. § 39-13-210(a)(1) (2018). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2018). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. A knowing mens rea is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93. "When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally." T.C.A. § 39-11-301(a)(2) (2018). A person "acts intentionally with respect to . . . the result of the conduct when it is the person's conscious objective or desire to . . . cause the result." *Id.* § 39-11-302(a).

The Defendant argues that he had no reason to commit a knowing killing of the victim, in that they "shared no children or property," and he "was free to exit the relationship as he chose." He argues that, although the evidence showed "minor tiffs" between himself and the victim in the days before the crime, they had reconciled and were happy and spent the day of the shooting together. He also argues that the evidence is insufficient because more than one possible bullet trajectory was established by the expert testimony and that his statement about where he held the gun when it discharged was consistent with his theory of the bullet's trajectory. The Defendant maintains that the shooting was accidental and argues that he is guilty, at most, of criminally negligent homicide or reckless homicide. *See* T.C.A. §§ 39-13-212 (2018) (criminally negligent homicide), 39-13-215 (2018) (reckless homicide).

Viewed in the light most favorable to the State, the evidence shows that the Defendant owned and was familiar with firearms, including the Ruger pistol used in the shooting. He showed the victim's daughter how to shoot the Ruger pistol, and he showed her how the safety mechanism worked. Despite his knowledge of firearms, he said he routinely pulled the trigger to check whether the safety was engaged. The Defendant said that, on the night of the shooting, the victim was in the kitchen area and that he pulled the trigger of the gun to check whether the safety was engaged. The gun was fully loaded, and it was pointed at the victim. The Defendant initially lied about the shooting being a suicide, and he lied about his relationship with the victim being untroubled and peaceful. Although

he claimed the gun had been on the table where he sat, he also claimed it may have been on the refrigerator. His uncle testified that he had not seen the gun on the table when he had been at the home a short time before the shooting. A rational jury could infer that the Defendant knew the direction in which the gun was pointed and that he knew the amount of force necessary to pull the trigger. A rational jury could also infer that the Defendant pulled the trigger with an awareness that his conduct was reasonably certain to cause the firearm to discharge and the bullet to strike the victim, causing her death. *See Page*, 81 S.W.3d at 790-93. The evidence is sufficient to support the Defendant's conviction of second degree murder.

In reaching this conclusion, we are mindful of the parties' focus at the trial on the status and nature of the Defendant and the victim's relationship around and at the time of the killing, the Defendant's various accounts of the shooting, the details of the bullet's trajectory, and the Defendant's and the victim's respective locations at the time the shot was fired. In our view, the Defendant's knowledge of and familiarity with his gun, his admitted action of pulling the trigger to check whether the safety was engaged while he was in close proximity of the victim and while the gun was pointed at her, and his initial untruthfulness about the shooting having been a suicide and the nature of their relationship provided sufficient evidence of his commission of second degree murder.

The Defendant is not entitled to relief on this basis.

## II

### Evidentiary Rulings

### A. Admission of the Defendant's Text Messages with the Victim and with an Ex-Girlfriend

The Defendant contends that the trial court erred in admitting the text message exchanges between the Defendant and the victim and between the Defendant and his ex-girlfriend. He argues that the messages were not properly authenticated, that they were inadmissible hearsay, and that they were unfairly prejudicial. The State responds that the trial court did not err in admitting the messages. We agree with the State.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the

discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

For questions related to hearsay evidence, we utilize a different standard of review. Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless it qualifies as an exception. *Id.* at 802. A trial court's factual findings and credibility determinations relative to a hearsay issue are binding upon an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that are reviewed de novo. *Id.*

### 1. Authentication

The Defendant argues that the text message evidence was not properly authenticated. As a predicate to admissibility, a witness with knowledge of the facts must verify and authenticate evidence, and its relevance must be demonstrated. *See* Tenn. R. Evid. 401, 901(a), (b)(1). The authentication requirement "is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). The party offering the evidence is required to "reasonably establish the identity and integrity of the evidence"; however, "this rule does not require that the identity . . . be proven beyond all possibility of doubt[.]" *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (citing *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)).

Rule 901 provides, in pertinent part:

(b) Illustrations. — By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

> (1) Testimony of Witness with Knowledge. – Testimony that a matter is what it is claimed to be.
>
> . . .
>
> (4) Distinctive Characteristics and the Like. – Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with other circumstances.
>
> . . .
>
> (9) Process or System. – Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.

Tenn. R. Evid. 901(b).

The Defendant argues that the police officer who used Cellebrite technology to extract text message data from the Defendant's, the victim's, and the Defendant's ex-girlfriend's cell phones did not describe the process or system by which the data was obtained and did not establish that the process or system produced accurate results. *See* Tenn. R. Evid. 901(b)(9). The officer testified that he had been trained to use the Cellebrite technology and that he had used it in this and other cases. He said that the process for verifying the accuracy of extracted information involved comparing selected extraction data, such as photographs and contacts, with the data stored in the cell phone to ensure that the extraction report was consistent with the contents of the cell phone.

This court has held that Cellebrite data was properly authenticated in cases which involved similar foundational testimony as that received in the present case. *See, e.g.*, *State v. Robert L. Cody, III*, No. E2022-00947-CCA-R3-CD, 2023 WL 9006670, at *15-16 (Tenn. Crim. App. Dec. 28, 2023) (police officer testified about his training and certification in using Cellebrite technology, his extraction of data from cell phones in the present case, and his identification of his extraction reports); *State v. Adam Holmes*, No.

-11-

E2021-01489-CCA-R3-CD, 2022 WL 16736968, at *10-11 (Tenn. Crim. App. Nov. 7, 2022) (police officer testified about the extraction process, her review of the extraction, and her belief based upon her training and experience that the Cellebrite report was "a fair and accurate representation of the data extracted" from the cell phone), *perm. app. denied* (Tenn. Feb. 8, 2023); *cf. State v. Humberto Morales*, M2019-00435-CCA-R3-CD, 2020 WL 5587406, at *21 (Tenn. Crim. App. Sept. 19, 2020) (holding that cell phone extraction evidence was properly authenticated without identifying whether Cellebrite technology was used to perform the extraction), *perm. app. denied* (Tenn. Jan. 13, 2021).

The record reflects that the police officer who performed the extractions was trained and certified to use Cellebrite. He identified the Defendant's and the victim's cell phones, and he explained that he had performed an extraction of the Defendant's ex-girlfriend's cell phone, which was returned to her after the extraction. The officer identified reports containing the extracted data. He described the processes by which he extracted the data and by which he verified the accuracy of the extractions. *See* Tenn. R. Evid. 901(b)(9) (Advisory Comm'n Cmts.) ("All that the lawyer need do is introduce evidence satisfying the court that the computer system produces accurate information."); *Humberto Morales*, 2020 WL 5587406, at *21 (stating that the person performing the cell phone extraction "was not required to verify each and every item in the report to establish the authenticity of the evidence"). The investigator assigned to the case also testified that he verified the accuracy of the reports by comparing them with the cell phones' contents. The State sufficiently established that the extraction reports were authentic, in that they were what the State represented them to be. *See* Tenn. R. Evid. 901. The trial court did not abuse its discretion in admitting the evidence.

In reaching this conclusion, we have considered the Defendant's argument that the Cellebrite reports admitted as evidence were improper under the so-called "best evidence rule," which provides that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress or the Tennessee Legislature." *See* Tenn. R. Evid. 1002. The Defendant posits that because the Cellebrite report "does not photograph the data on a device in its original format," it is not an original or duplicate and is, instead, a new document which purports to represent what is on the cell phone upon which the extraction was performed. We are unpersuaded. The import of the text messages in the present case was their verbiage, not their appearance. The Cellebrite reports contained relevant evidence, albeit not as a photographic replication of the data as it appeared on the cell phones. "The best evidence rule is a rule of preference rather than exclusion." *Iloube v. Cain*, 397 S.W3d 597, 602 (Tenn. Ct. App. 2012).

-12-

The Defendant is not entitled to relief on this basis.

### 2.  Text Messages

We turn to the Defendant's claim that the messages he received from the victim and his ex-girlfriend in the days leading to the crime should have been excluded.  He argues that the trial court erred in admitting the messages because they were not relevant, were inadmissible hearsay, and were inadmissible because the danger of unfair prejudice from their admission substantially outweighed any probative value.  *See* Tenn. R. Evid. 401, 402, 403, 801(c).

When the issue of admissibility of the Defendant's text message exchanges with the victim and with his ex-girlfriend was raised, the trial court ruled that the Defendant's messages to the women were admissible as statements of a party-opponent pursuant to Tennessee Rule of Evidence 803(3).  The State argued that the messages from the victim and the Defendant's ex-girlfriend should be admitted to show the context in which the statements in the Defendant's messages were made, and the Defendant countered that the third-party messages were irrelevant hearsay.

When the trial court first considered the issue, it found that some of the messages the Defendant sent the victim "were statements of emotion and . . . statements of intent . . . that would be excepted hearsay" and that the rest of the messages were "[n]ot really being offered for a factual declaration purpose, in a non-hearsay purpose of just providing context to the defendant's statements and demonstrating just the nature of their relationship at that time."  The court said it would provide a limiting instruction to the jury regarding its consideration of this evidence.

With respect to the messages to the ex-girlfriend, the trial court noted, "[T]here have been statements before the jury that the defendant is a good man, by the defense.  So regardless of what assertions were made prior to trial, I think the State should be given some leeway to rebut that to some extent."  The court also found that the "main reason" the evidence should be admitted was to show the Defendant's mens rea relative to the killing.  The court found that evidence of a relationship with another woman could be argued to provide a motive for the killing.  The court found that the evidence was relevant, was not a "prior bad act in the sense that it bears on his character or his . . . propensity for violence," and that it was evidence of the Defendant's state of mind on the day before the shooting.  The court redacted from an exhibit some of the ex-girlfriend's messages about the Defendant's having slapped her.  The court found that the ex-girlfriend's messages the court had not redacted were relevant to show her "present emotion or her intent or plan"

-13-

and were admissible "for the non-hearsay purpose of showing the effect on the listener, [the Defendant], and to provide context to the statements he made which certainly are admissible."

When conducting a charge conference later during the trial, the trial court reconsidered its ruling, making the following findings:

I know the defense had requested an instruction regarding the contextual text messages that we've admitted here. So here's what I've come up with. I can show it to you guys.

"You have heard testimony and seen exhibits concerning text messages allegedly sent to and from the defendant. As you were instructed earlier, only the statements allegedly made by the defendant may be considered as substantive evidence in this case. The text [messages] sent by any other parties shall not be considered as substantive evidence. They may only be considered to provide context to the texts and statements allegedly made by the defendant.

"You shall not consider the text made [sic] by any person other than the defendant as proof of the truth of the matter asserted in those texts. While you may consider the texts allegedly sent by the defendant as substantive evidence, you are not required to do so. You shall follow the instructions above related to alleged statements of the defendant when evaluating this testimony."

I wanted to show that, guys, to you and also explain my thinking in light of the objection that was made by the defense during the State's closing argument. I understand when I admitted all of these text messages that we have in evidence, that I said there was really dual theory of admissibility.

One, as it relates to third parties. I think many of those texts were excepted hearsay in that the declarants were stating an emotion, a state of mind or an intent to do something. Under the rules those could be considered as substantive evidence of the truth of the matter asserted.

However, there were other text messages that I thought were clearly only admissible under a theory of providing context for what the defendant

was saying in his text messages. Under that theory, those particular text messages would not be able to be considered as substantive evidence.

It places me in a real quandary as to how to properly instruct the jury, where some of these third-party text messages are substantive evidence, some of them are not substantive evidence.

I think it would be impossible given the number of text messages we have in this case, and I think it would also be very confusing to the jury if we went through line-by-line and said, okay, you can consider this as substantive evidence but you cannot consider this as substantive evidence.

I think the simpl[e]st way to do this, and I think this is actually the way that would give the benefit of the doubt to the defendant in this particular situation, is just to say that all of these third-party texts are contextual and may not be considered as substantive evidence.

It still allows the State the opportunity to argue those during closing argument, and I think at the end of the day it still allows the State to demonstrate what they're getting at here, that this was a relationship that was having some difficulty.

The trial court inquired if the parties had any objection to the instruction, and both the State and the defense indicated that they had none.

### A. Messages from the Victim

The Defendant argues that the victim's text messages were not needed to provide context for his messages and that they were, instead, "essential for the truth that the [S]tate argued they asserted: that there were problems between the victim and the [Defendant]."[2]

---

[2] The Defendant also argues that the trial court erred in ruling that some of the messages were admissible under the hearsay exception for then-existing mental, emotional, or physical condition. *See* Tenn. R. Evid. 803(3). As we have outlined above, this exception was discussed during the trial, but the court ultimately ruled that the jury would be confused by its admitting some of the messages sent from third parties to the Defendant as substantive evidence but not others. Thus, the court ruled that none of the third-party messages to the Defendant were admissible as substantive evidence, and it crafted a jury instruction in accord with its ruling. When asked if the parties objected, both parties affirmatively indicated that they had no objection. We presume that the jury followed the court's instructions. *See State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998).

This court has recognized that statements which are not offered for their truth and, instead, are offered to provide context or understanding of another statement, are admissible. *State v. Marcus Roshone Perry*, No. M2020-01407-CCA-R3-CD, 2022 WL 1195311, at *5 (Tenn. Crim. App. Apr. 22, 2022) (third-party text messages sent to the defendant were admissible to provide context to the defendant's text messages), *perm. app. denied* (Tenn. Nov. 16, 2022); *State. v. Alain Benitez*, No. M2021-00073-CCA-R3-CD, 2022 WL 1231075, at *18-19 (Tenn. Crim. App. Apr. 27, 2022) (the defendant's social media messages to third parties were admissible as admissions of a party opponent, and messages from third parties to the defendant were admissible to provide context for the defendant's messages), *perm. app. denied* (Tenn. Sept. 29, 2022); *State v. Joshua Hill-Williams*, No. W2015-01743-CCA-R3-CD, 2017 WL 1907735, at *12 (Tenn. Crim. App. May 9, 2017) ("[T]he text messages received by the Appellant were necessary to put the text messages he sent into context."), *perm. app. denied* (Tenn. Aug. 18, 2017). The jury was instructed that the victim's messages were not to be considered as substantive evidence, and we presume that the jury followed the trial court's instructions. *See Williams*, 977 S.W.2d at 106.

The Defendant takes specific issue with three messages, in which the victim tells the Defendant that he is "starting to make [her] feel uneasy," that he is "real life f------ crazy," and that he is "negative." He argues that they were "highly inflammatory." We have considered whether these messages should have been excluded pursuant to Tennessee Rule of Evidence 403, which provides for exclusion of otherwise relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In that regard, we conclude that the court did not abuse its discretion. The messages were part of a larger, ongoing exchange involving the Defendant's and the victim's relationship problems, and significantly, the victim's messages were not offered for their truth. The jury was instructed to limit its consideration of the victim's messages to the context they provided in understanding the substance of the Defendant's text messages. The probative value of the victim's messages as contextual evidence was not substantially outweighed by the danger of unfair prejudice.

### B. Messages from the Defendant's Ex-Girlfriend

The Defendant argues that the trial court abused its discretion in admitting his ex-girlfriend's text messages. He argues that the messages were not relevant and necessary to provide context to help the jury understand the Defendant's text messages and that the

messages were "irrelevant character assassination" which painted him "as a two-timing womanizing cheater." *See* Tenn. R. Evid. 401, 402, 403, 404(b). The State argues that the messages were relevant to establish the Defendant's motive for the killing.

The Defendant argues, first, that his ex-girlfriend's messages were not relevant to show motive because he was not married to or cohabitating with the victim and had no assets or children with the victim. Therefore, he reasons, he would not have needed to kill the victim in order to rekindle a relationship with his ex-girlfriend. As we have noted, the trial court found that the ex-girlfriend's messages were relevant to provide context for the Defendant's messages. The Defendant has not challenged the trial court's ruling as to the relevance of his own text messages, which were the substantive evidence available for the jury's consideration. It follows that because the ex-girlfriend's messages were offered to provide context to the Defendant's messages, her messages were relevant to the extent to which they provided this context. Their relevance was not based upon their substance, which was outside the jury's consideration.

We turn to the question of whether the messages, despite relevance, were inadmissible pursuant to Tennessee Rule of Evidence 404(b), which prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id*.; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Before a trial court determines the admissibility of such evidence,

>  (1) The court upon request must hold a hearing outside the jury's presence;

>  (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

>  (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

>  (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4).

-17-

The trial court found that the text messages between the Defendant and the ex-girlfriend were admissible because they were relevant to "the defendant's state of mind, his mens rea, his motive" in shooting the victim. The court found that, to the extent the messages showed an ongoing relationship between the Defendant and someone other than the victim, they were not evidence that "bears on his character or his propensity," particularly not evidence of a propensity for violence. The court found that the evidence was "intrinsic to the case." However, the court limited the jury's consideration of the ex-girlfriend's messages to the context they provided for understanding the Defendant's messages. Thus, to the extent that the Defendant characterizes the ex-girlfriend's messages as prior bad act evidence, they were not barred by Rule 404(b) because they were not used as substantive evidence of any prior crime, wrong, or act attributable to the Defendant.

Finally, we consider whether the trial court erred in ruling that the evidence was not barred by Rule 403. The Defendant argues that the State used this evidence to portray him as "a smooth-talking cheating cad, who was seeing multiple women at once." He posits that nothing in his ex-girlfriend's text messages made it more probable that he killed the victim and, instead, the messages made it more probable that the jury would be unfairly prejudiced against him. The State's trial theory was that the Defendant knowingly shot the victim in the culmination of days of disagreement about the relationship. The Defendant's messages were the substantive source of information about his interest in rekindling the relationship with the ex-girlfriend. As we have stated, the trial court ruled that this was relevant evidence to support the State's theory, and the Defendant has not challenged this ruling on appeal. The ex-girlfriend's messages were offered to provide context, and as such, they were highly probative of context, not of their truth. The jury was instructed about the parameters within which it could consider the ex-girlfriend's messages, and we presume the jury followed the court's instructions. *See Williams*, 977 S.W.2d at 106. The probative value of the ex-girlfriend's messages as contextual evidence was not substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion in determining that Rule 403 did not bar the ex-girlfriend's messages.

The Defendant is not entitled to relief on this basis.

## C. Admission of the Defendant's Pretrial Statement

The Defendant argues that the trial court abused its discretion by admitting the Defendant's pretrial statement. In his view, the statement was not admissible under Tennessee Rules of Evidence 608(b) or 613.

The record reflects that the Defendant filed a motion in limine seeking exclusion of a portion of his pretrial statement to the police. His motion alleged that the statement should be suppressed because it had been given while he was in custody but without *Miranda* warnings, but defense counsel acknowledged when the motion in limine was

heard that his motion was untimely as a motion to suppress. The motion was also based on Tennessee Rule of Evidence 608, related to impeachment of a witness's credibility with specific instances of conduct.

In the statement, the Defendant initially said that the victim had committed suicide but later said that he shot her accidentally. In his motion in limine, the Defendant argued that the initial claim that the victim committed suicide, which he acknowledged was false, should be excluded because the State "is not seeking to admit that part of the statement for its truth" and, instead, "is seeking to admit that part of the statement as extrinsic evidence that [the Defendant] lied." The Defendant theorized that the initial claim that the victim committed suicide was inadmissible unless the Defendant testified. The trial court denied the motion, rejecting the Defendant's argument that Rule 608 applied and finding that the evidence was relevant and admissible as a statement of a party-opponent. *See* Tenn. R. Evid. 401, 402, 608, 803(1.2).

The trial court found that the Defendant's statement was relevant. *See id.* at 401, 402. On appeal, the Defendant does not challenge this finding.

Tennessee Rule of Evidence 608(b) states, in relevant part, that

> [s]pecific instances of conduct of a witness for the purpose of attacking . . . the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . . be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness.

The trial court found that although defense counsel had offered "a very clever reading of Rule 608," the Defendant's statement was admissible as an admission of a party opponent under Rule 803(1.2). Significantly, the Defendant did not testify, and the State did not use his statement as a basis for inquiry on cross-examination into specific instances of conduct for the purpose of challenging his character for truthfulness or untruthfulness. Thus, Rule 608 was inoperative in this instance.

With regard to the Defendant's argument that his statement was inadmissible pursuant to Rule 613(b), we agree. This rule provides:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

This provision does not apply to admissions of a party-opponent as defined in Rule 803(1.2).

However, because the Defendant was not a trial witness, Rule 613(b) did not apply. Further, the evidence was admissible pursuant to Rule 803(1.2).

Rule 803(1.2) provides that certain statements are not excluded by the hearsay rule, including, "[a] statement offered against a party that is . . . the party's own statement in either an individual or a representative capacity." The Defendant argues that the State did not offer certain portions of his statement, in which he claims that the shooting was a suicide and an accident, for the truth of those assertions. As Rule 803(1.2) provides, statements of a party-opponent are not excluded by the hearsay rule. The Defendant's pretrial statement was an admission of a party-opponent, and the trial court did not abuse its discretion in so determining.

The Defendant is not entitled to relief on this basis.

### D. Exclusion of the Defense Investigator's Testimony

The Defendant contends that the trial court abused its discretion in excluding evidence of the Defendant's statements to the defense investigator. He argues that he should have been allowed to question his investigator "about the consistency of the statements [the Defendant] had made to the investigator and to the defense expert concerning where [the Defendant] had been sitting when the gun went off." The State counters that the court did not abuse its discretion because the evidence (1) was hearsay, and (2) consisted of opinion testimony which would not have been "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." *See* Tenn. R. Evid. 701(a)(2), 802.

At the trial, defense counsel asked the defense investigator if the Defendant gave "an account consistent with that --," at which point the prosecutor objected that the question was eliciting "an improper opinion," and the trial court sustained the objection. Defense counsel then asked the investigator if the Defendant "shared . . . his position [at the time of the shooting]" with the investigator. The prosecutor objected, and the court overruled the objection. The investigator then stated that the Defendant had "shared . . . his positioning within the residence" and agreed the Defendant had been "forthright" with him.

At the hearing on the motion for a new trial, the Defendant made an offer of proof of the defense investigator's testimony about the Defendant's statements to him. The investigator testified that when he went to the Defendant's home, the investigator took measurements based upon the Defendant's statements and demonstrations about where the Defendant held the gun at the time of the shooting. The investigator said the Defendant's

-20-

position was consistent through multiple demonstrations. The investigator said he was present when the defense expert came to the Defendant's home, and the investigator said the Defendant's demonstration of where he sat at the time of the shooting was consistent with the Defendant's demonstrations to the investigator. The investigator said he visited the Defendant's home in June 2021, February 2022, and March 2022, and that the Defendant's demonstrations were consistent each time about where he sat, how he held the gun, and how far from the table the gun was when the shooting occurred. The investigator later acknowledged that he only spoke with the Defendant about the Defendant's positioning at the time of the shooting on the latter two occasions.

The trial court did not abuse its discretion in determining that the Defendant's statements to the investigator about his positioning were hearsay. They were out-of-court statements used to prove the truth of the matter. *See* Tenn. R. Evid. 802.

The question which remains is whether the investigator should have been permitted to testify that the Defendant gave consistent accounts about his positioning, without the investigator disclosing the substance of those accounts. Tennessee Rule of Evidence 701(a) permits lay opinion testimony if the testimony is: "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."

The Defendant argues that the evidence was critical to show that he had been under the influence of a traumatic event when he gave the statement to the police, in which he gave inconsistent accounts about his positioning when the shooting occurred, and that he was later "able to more accurately remember the details of the event" after he had regained his composure and reflected upon the circumstances of the shooting. In rejecting this argument, the trial court found:

> I think it is an improper opinion for a witness to give his opinion as to whether statements provided to him were consistent. I think that invades the province of the jury. I think when that issue comes into play, it should be up to the jury to look at the competing statements and decide for themselves whether they are consistent or inconsistent and how that affects the credibility of the declarant.

The court also observed, "[Y]ou can't get to the ultimate conclusion that the [Defendant's] statements were consistent without somehow relying upon the underlying substance of those statements. So I think it was improper lay opinion testimony as well as inadmissible hearsay."

As a general rule, lay witness testimony is confined to narrating the facts based upon personal knowledge and should not encompass personal opinions. *Blackburn v. Murphy*,

737 S.W.2d 529, 531 (Tenn. 1987) (citing Paine, *Tennessee Law of Evidence*, § 168); *State v. Roscoe L. Graham and Kendrick L. Cavil*, No. 02C01-9507-CR-00189, 1999 WL 225853, at *7 (Tenn. Crim. App. Apr. 20, 1999).

In essence, the Defendant's attempt to elicit lay opinion testimony as to his prior allegedly consistent statements about his positioning at the time of the shooting was an effort to, in a roundabout way, present inadmissible hearsay evidence, and more directly, to bolster selectively the evidence from his prior statement that supported the defense theory that he sat at the table, picked up the gun, and fired it while checking to see if the safety was engaged. None of this was proper. *See* Tenn. R. Evid. 701(a)(2), 802. The trial court did not abuse its discretion in excluding the defense investigator's opinion testimony about whether the Defendant had provided consistent accounts about his positioning at the time of the shooting.

The Defendant is not entitled to relief on this basis.

### III

### Cumulative Error

The Defendant contends that he is entitled to a new trial because the cumulative effect of multiple trial errors deprived him of his right to a fair trial. The State responds that relief is not required because cumulative errors did not occur, and we agree.

The cumulative error doctrine requires relief when "multiple errors [are] committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).

The Defendant has failed to demonstrate the existence of multiple trial errors. This defeats his cumulative error claim. He is not entitled to relief on this basis.

# IV

## Sentencing

In his last issue, the Defendant contends that his twenty-two-year sentence is excessive. The State responds that the trial court did not abuse its discretion at sentencing. We agree with the State.

At the sentencing hearing, the trial court received the presentence report as an exhibit, and it reflected that the then-forty-eight-year-old Defendant was a high school graduate who had taken some community college coursework but had not completed a degree. He reported fair mental and good physical health. He said he began using alcohol at age ten and marijuana at age twelve, that he drank "a beer or two a couple of times a week" until March 2022, that he used marijuana a couple of times a year, and that he had used ecstasy four times in 2021 and 2022. He participated in mental health counseling following the offense in this case. He had never been married but had seven children, with five of them being minors and four of them being the subject of court-ordered child support obligations totaling $1000 per month. He had a substantial child support arrearage, as well. He had worked for the same employer for twenty years but had been placed on leave and was in the process of being "retired" as a result of his conviction in the present case. No Strong-R Risk Assessment was conducted "due to the Defendant being convicted of a Class A felony."

Victim impact reports, which were attached as an addendum to the presentence report, were completed by the victim's mother, father, and aunt. The victim's parents also gave verbal victim impact statements at the sentencing hearing. All the family members stated that they had suffered psychological injury as a result of the crime. The aunt said that the victim's daughter was not in a favorable living situation and that the victim's family was not allowed to see the daughter "like before," with the daughter now living with her father's family. The victim's aunt also authored a narrative statement, which described the victim, the victim's love for her daughter, and the effects of the victim's death on the victim's family.

In an allocution, the Defendant stated that the shooting had been an accident. He spoke kindly of the victim and said he would never want his children to endure what the victim's daughter had experienced. He apologized for the victim's death and said he prayed daily about it.

In considering the length of the sentence to impose, the trial court found that the catchall mitigating factor applied based upon the Defendant's "family situation," noting his education, employment history, and financial support of his family. *See* T.C.A. § 40-35-113(13) (2019) (subsequently amended). The court applied enhancement factor (1),

related to prior criminal convictions or behavior, but afforded it slight weight. *See id.* § 40-35-114(1) (2019) (subsequently amended). The court also enhanced the Defendant's sentence based upon his employment of a firearm during the commission of the offense. *See id.* at (9).

The court also made the following observations:

> Of course one of the mandatory considerations that I must think about when sentencing would be the nature and the characteristics of the criminal conduct. One of the reasons this case is so tragic is I really don't think -- I don't have the feeling after hearing the proof that [the Defendant] woke up that morning and thought that he would be killing [the victim] at the end of the day. But it happened. He took a human life and we must respect the preciousness of all human life, including [the victim's].

> A few things about this case that stand out to me would be of course [the Defendant's] reporting it as a suicide. Allowing [the victim's] daughter to believe that her mother had taken her own life, him not rendering aid to [the victim], and then allowing her child to view her in that condition. We heard testimony that she was aspirating basically at the time.

> I think there must be some account in this sentence that the Court delivers, the nature and the characteristics of that conduct. I think the jury rejected the theory that this was a reckless killing and as such the Court can't let that hang over the sentence that it imposes here today.

> The Court has to view this for what it is; a knowing killing of another, that [the Defendant] procured a gun and shot [the victim] in the head causing her death. That's what happened here and that's what the jury found beyond a reasonable doubt.

For his Class A felony conviction, the Defendant, a Range I offender, faced a sentence of fifteen to twenty-five years. *See id.* §§ 39-13-210(c)(1), 40-35-112(a)(1) (2019). After announcing its findings, the trial court imposed a twenty-two-year sentence.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to

sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the potential for rehabilitation or treatment, and the result of the validated risk and needs assessment. T.C.A. §§ 40-35-103 (2019), -210 (2019); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The Defendant argues that a sentence "near the top of the range" was inappropriate. He does not contend that the trial court misapplied any enhancement factors and, instead, argues generally that the sentence is greater than deserved and not the least severe measure necessary to achieve the purposes of the Sentencing Act.

The record reflects that the trial court engaged in a thorough and thoughtful consideration of the principles of sentencing, the statutory considerations, the mitigating and enhancement factors, and the facts of the case. The Defendant argues that he called 9-1-1 to obtain help for the victim and that he had led a productive life until the shooting. However, the court was compelled by other relevant facts in reaching its decision as to a twenty-two-year sentence. Those factual determinations are supported by the record. The court did not abuse its discretion in sentencing the Defendant. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-25-